Michael L. Baum, Bar Number 119511
Bijan Esfandiari, Bar Number 223216
Kate E. Gillespie, Esq., Bar Number 227416
BAUM HEDLUND ARISTEI & GOLDMAN
12100 Wilshire Blvd., Suite 950
Los Angeles, CA  90025
Tel: (310) 207-3233
Fax: (310) 207-4204

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROSEMARY DORSETT, individually and as successor-in-interest to NOE CARRASCO, deceased, <br><br> Plaintiffs, <br><br> vs. <br><br> SANDOZ, INC., a Delaware Corporation; ELI LILLY AND COMPANY, a Indiana Corporation, <br><br> Defendants. | Case No.: 2:06-cv-7821 AHM (AJWx) <br><br> Hon. A. Howard Matz <br><br> **PLAINTIFF'S OPPOSITION TO DEFENDANT SANDOZ, INC.'S MOTION FOR SUMMARY JUDGMENT ON GROUNDS OF LACK OF DUTY AND PROXIMATE CAUSE** <br><br> (Filed concurrently with Statement of Genuine Issues, Declarations of Bijan Esfandiari, Rosemary Dorsett and Vanessa Dorsett, and [Proposed] Order) <br><br> Date:          December 6, 2010 <br> Time:          10:00 a.m. <br> Courtroom: 14 <br> Hon. A. Howard Matz |

# TABLE OF CONTENTS

**Page**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  Noe Carrasco, Who Prior to Taking Fluoxetine Had Never Been Suicidal, Is Prescribed Fluoxetine and Commits Suicide 36 Days Later . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.  As A Result of Lilly's Massive Marketing Campaign, Prozac Became A Household Name and A Blockbuster Drug . . . . . . . . . . . . 2

    C.  Sandoz Begins Manufacturing Generic Prozac (Fluoxetine) . . . . . . . . 3

    D.  Sandoz Knew or Should Have Known About Fluoxetine's Suicide Risks and Need for Co-Administration of Sedatives, Yet Failed To Issue Any Warnings to Dr. Abend . . . . . . . . . . . . . . . . . . 3

    E.  As A Result of Lilly's Direct and Indirect Marketing Tactics, As Well As Sandoz' Subsequent Silence, Dr. Abend Was Led to Believe that Fluoxetine is Safe and Effective . . . . . . . . . . . . . . . . . . . . . 4

II.  AT THIS PROCEDURAL POSTURE, THE COURT IS OBLIGATED TO DRAW ALL INFERENCES IN PLAINTIFF'S FAVOR . . . . . . . . . . . . 5

III. SANDOZ HAD AN AFFIRMATIVE DUTY TO WARN DR. ABEND REGARDING SERIOUS RISKS ASSOCIATED WITH FLUOXETINE AND IT FAILED TO DO SO . . . . . . . . . . . . . . . . . . . . . . 6

IV.  SANDOZ' FAILURE TO PROVIDE ADEQUATE WARNINGS CAUSED PLAINTIFF'S INJURY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.  Sandoz' "Failure to Warn" Is Not A Valid Defense to Plaintiff's Failure to Warn Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.  Dr. Abend's "Failure" to Read A Warning that Was Never Issued To Him Does Not Absolve Sandoz of Its Liability, Particularly Given That Dr. Abend Testified He Would Not Have Prescribed Fluoxetine Had Sandoz Warned Him Regarding Its Risks . . . . . . . . . 9

    C.  Sandoz Had A Myriad of Avenues Available to It To Make Sure That Its Warnings Reached Dr. Abend, However, It Failed to Undertake Any Steps to Warn Dr. Abend . . . . . . . . . . . . . . . . . . . . . 11

    D.  Sandoz's Recitation of Irrelevant Facts Do Not Refute Dr. Abend's Testimony That, Had He Been Adequately Warned, He Would Have Altered His Prescribing Decision . . . . . . . . . . . . . . . 13

V.  AS MANDATED BY *MOTUS*, DR. ABEND TESTIFIED THAT, HAD SANDOZ ADEQUATELY WARNED HIM, HE WOULD HAVE CHANGED HIS PRESCRIBING DECISION . . . . . . . . . . . . . . . . . . . . . . . 14

VI.   A TALE OF TWO CITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

VII.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

# TABLE OF AUTHORITIES

**Page**

### Federal Cases

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Demahy v. Actavis, Inc.*,
   593 F.3d 428 (5th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Eli Lilly & Co. v. Natural Answers, Inc.*,
   86 F.Supp.2d 834 (S.D.Ind. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Forst v. SmithKline Beecham*,
   602 F.Supp.2d 960 (E.D.Wis. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Forst v. SmithKline Beecham*,
   639 F.Supp.2d 948 (E.D.Wis. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*In re Novartis Wage and Hour Litigation*,
   611 F.3d 141 (2nd Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In Re Zyprexa Products Liability Lit.*,
   253 F.R.D. 69 (E.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Motus v Pfizer*,
   196 F.Supp.2d 984 (C.D.Ca. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11, 14

*Munroe v. Barr Laboratories, Inc.*,
   670 F.Supp.2d 1299 (N.D.Fl. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Swicegood v. Pliva, Inc.*,
   2010 WL 1138455 (N.D.Ga., March 22, 2010) . . . . . . . . . . . . . . . . . . . 12

*Thompson v. Western States Medical Center*,
   535 U.S. 357, 122 S. Ct. 1497 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Tucker v. SmithKline Beecham*,
   701 F.Supp.2d 1040 (S.D.Ind. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*UFCW Local 1776 v. Eli Lilly and Co.*,
   __ F.3d __, 2010 WL 3516183 (2nd Cir. Sept. 10, 2010) . . . . . . . . . . . . . . . 3

*Washington Legal Foundation v. Friedman*,
   13 F.Supp.2d 51 (D.D.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Washington Legal Foundation v. Henney*,
   202 F.3d 331 (D.C.Cir. Feb 11, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Weilbrenner v. Teva Pharmaceuticals USA, Inc.*,
   696 F.Supp.2d 1329 (M.D.Ga. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

**State Cases**

*Conte v. Wyeth, Inc.*,
   168 Cal.App.4th 89 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11

*Kampmann v. Mason*,
   921 So.2d 1093 (La.App., 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Stevens v. Parke Davis & Co.*,
   9 Cal.3d 51, 107 Cal.Rptr. 45 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**State Statutes**

CAL.BUS. & PROF.CODE § 4073 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**INTRODUCTION**

Plaintiff contends that Sandoz failed to warn Robert P. Abend, M.D., the decedent's treating physician, regarding the true suicide risks associated with its drug fluoxetine.  In defense, Sandoz argues that its failure to warn is a valid defense to Plaintiff's failure to warn claims.  The mere recitation of Sandoz' argument is sufficient to refute it.

Sandoz tees off its motion by arguing that it had no duty to warn Dr. Abend about fluoxetine's suicide related risks and need for co-administration of sedatives to offset those risks.  Sandoz' argument conflicts with California Supreme Court precedent which mandates that drug manufacturers provide adequate warnings to treating physicians and, in this case, Dr. Abend testified that he was not adequately warned regarding fluoxetine's suicide risks and was *never* warned regarding the need for co-administration of sedatives to counter those risks.   Sandoz next argues that, because Dr. Abend never read the warning, *which Sandoz never gave*, it should be cleared of all liability.  In sum, Sandoz argues that its failure to warn is a complete defense.  Such illogical arguments have already been rejected by other courts.  Finally, relying upon a myopic and unfaithful recitation of the record, Sandoz argues that Dr. Abend never testified that an adequate warning would have changed his prescribing decision.  Sandoz' argument is refuted by the record.  Dr. Abend testified that, had he been adequately warned, he would not have prescribed Prozac and "**probably would have prescribed another medication**."  Exh. 1, Abend Depo. at 275:10-24.  Sandoz' failure to even mention this key testimony suggests it too recognizes this testimony is fatal to its request for summary judgment.

**I.      STATEMENT OF FACTS**

**A.      Noe Carrasco, Who Prior to Taking Fluoxetine Had Never Been Suicidal, Is Prescribed Fluoxetine and Commits Suicide 36 Days Later**

Noe Carrasco was a loving son and a devoted brother.  He enjoyed athletics, was an avid motorcycle rider and had a number of ambitions and goals, including, finishing his technical studies and pursuing a career in internet website design.  He had no prior

Plaintiff's Opposition To Sandoz, Inc.'s Motion for Summary Judgment

psychiatric history and no previous suicide attempts.  On July 15, 2004, during a routine physical examination with his primary care physician, Robert P. Abend, M.D., Noe mentioned that he was having difficulty sleeping and feeling overwhelmed at times.  *See* Plaintiff's Statement of Genuine Issues, Proposed Additional Findings of Fact ("PFF") 67.  Dr. Abend diagnosed Noe with moderate depression and prescribed fluoxetine (generic Prozac).  PFF 67.  Dr. Abend did not believe Noe was suicidal.  PFF 68.  After starting fluoxetine, Noe began to suffer from the drug's side effects, including akathisia, out-of-the-ordinary behavior and agitation.  PFF 69; see also Decl of Rosemary Dorset at ¶¶ 5-7.  On August 20, 2004, after being on fluoxetine for approximately five weeks, Noe, while under the influence of fluoxetine, took his own life by shooting himself in the chest in the garage of a friend's home.  PFF 70.  When his body was found by the police, he was holding an open Bible in his lap.  *Id.*  A post-mortem analysis of Noe's blood conducted by the coroner tested positive for fluoxetine.  PFF 72.  Noe was 26years old. *Id.*

## B.    As A Result of Lilly's Massive Marketing Campaign, Prozac Became A Household Name and A Blockbuster Drug

Prozac (fluoxetine) was approved by the FDA for the treatment of depression in December 1987.  PFF 73.  Between 1987 and 2001, Prozac was developed, manufactured and distributed exclusively by co-defendant Eli Lilly and Company ("Lilly").  PFF 73. As a result of Lilly's extensive marketing campaign, which included among other things: (a) direct sales visits with physicians, including Dr. Abend; (b) drafting of favorable articles in reputable journals by Lilly scientists and undisclosed consultants and key opinion leaders; (c) presentation and sponsorship of Continuing Medical Education (CME) courses; and (d) direct-to-consumer advertising on television, internet and magazines, Lilly was able to convince physicians and patients that Prozac is a safe and

effective drug.[1]  Lilly's colossal marketing campaign turned Prozac into a household name and made Prozac one of the first "blockbuster"drugs with annual sales in the billions of dollars.[2]

In 2001, Prozac lost its patent protection (PFF 75), thus opening the door for generic manufacturers to share in Lilly's bounty.  No doubt, seeing that there was money to be made, Sandoz entered the market and began to manufacture and sell a generic version of Prozac (fluoxetine).  PFF 75.

**C.      Sandoz Begins Manufacturing Generic Prozac (Fluoxetine)**

Sandoz traces its origins to Europe and has been manufacturing and selling pharmaceutical products since the 1800s.  See Exh. 55, 56.  In 1996, through various mergers, Sandoz formed Novartis, one of the largest drug companies in the world.  Exh. 56.  According to Sandoz' website, in 2003, Sandoz became the generic pharmaceuticals subsidiary of Novartis.  *Id.*  Sandoz has offices and facilities all over the world and its headquarters are located in Germany.  Exh. 55 & 57.  In or about 2001, Sandoz (and its predecessors) began to manufacture and distribute fluoxetine.  Exh 54 Sandoz' Answer Complaint (Second) at  at ¶ 9.

**D.      Sandoz Knew or Should Have Known About Fluoxetine's Suicide Risks and Need for Co-Administration of Sedatives, Yet Failed To Issue Any Warnings to Dr. Abend**

As a generic manufacturer, Sandoz had access to Lilly's clinical trials which showed that patients on fluoxetine experienced more suicidal events than patients taking

---

[1]  The facts in support of Lilly's marketing campaign are outlined in greater detail in Plaintiff's Opposition to Lilly's Summary Judgment Motion and Plaintiff's Statement of Genuine Issues In Opposition to Lilly's Motion (PFF Nos. 68-88; 94-108; 112-119), both of which are being filed concurrently herewith.

[2]  A judicial decision reported that "Prozac generated $2.6 billion in annual sales before a U.S. appeals court stripped the drug of patent protection in 2001."  *In Re Zyprexa Products Liability Lit*., 253 F.R.D. 69, 104 (E.D.N.Y. 2008), *rev'd on other grounds by UFCW Local 1776 v. Eli Lilly and Co.*, __ F.3d __, 2010 WL 3516183 (2nd Cir. Sept. 10, 2010); *see also Eli Lilly & Co. v. Natural Answers, Inc.*, 86 F.Supp.2d 834, 836 (S.D.Ind. 2000) (discussing the financial success Prozac had reached as a result of its marketing).

competing antidepressants.  PFF 84.[3]  This data showed that the suicide attempt rate for fluoxetine was significantly higher than other competing antidepressants and placebo. PFF 82-95.  Sandoz had access to and knew or should have known that, during the clinical trials of fluoxetine, certain patients were co-administered sedatives to offset the increased suicide risks.  PFF 85-95.  As a European pharmaceutical company with its global headquarters in Germany, Sandoz had access to and knew or should have known that, as a result of fluoxetine's suicide risks, the German government initially rejected Lilly's fluoxetine new drug application and only permitted it to be marketed following Lilly's agreement to issue a warning regarding the need to co-administer sedatives to offset the suicide risks.  PFF 94-95.  Sandoz also had access to and should have known of the various public reports and articles concerning fluoxetine's association with an increased risk of suicidality.  PFF 98-102.  Despite knowledge of this information, Sandoz failed to issue any suicide warnings or instructions regarding the risks and recommendation to co-administer sedatives to Dr. Abend or the U.S. medical community. PFF 82-106.

### E.   As A Result of Lilly's Direct and Indirect Marketing Tactics, As Well As Sandoz' Subsequent Silence, Dr. Abend Was Led to Believe that Fluoxetine is Safe and Effective

As a result of visits by Lilly's sales representatives, his review of Prozac's literature, and his review of medical journal articles, some of which were written by or referenced the works and studies of Lilly and its consultants, Dr. Abend became convinced that Prozac (fluoxetine) was a safe and effective drug and began to administer it to his patients, including Noe.[4]  Naturally, once Prozac's patent expired in 2001, pharmacists, as they are permitted to do under California law, dispensed generic versions

---

[3] *Forst v. SmithKline Beecham*, 639 F.Supp.2d 948, 956 (E.D.Wis. 2009) (noting that generic manufacturers have access to name-brand manufacturers' clinical trials data); *see also* Exh 58, Sandoz' Response to Interrogatories No. 12 (Fourth Set) ("Generic manufacturers...rely on the safety and efficacy testing done by the drug innovator...")

[4] See Plaintiff's Statement of Genuine Issues (Fact Nos. 68 -88) In Response to Lilly's Summary Judgment Motion, filed concurrently herewith.

to patients.   CAL.BUS. & PROF.CODE §4073.   When Noe went to fill and refill his fluoxetine prescription, he was given a generic version manufactured by Sandoz. Exh.63.

Dr. Abend knew that Prozac was available in generic form, but, like most physicians, did not know the names of the specific generic manufacturers. Exh. 1, Abend Depo. at 56:18-22.   He, however, expected all drug companies to provide him with accurate information regarding the risks and benefits of their drugs (*id.*, at 48:19-49:2) and testified that, had Sandoz informed him of the magnitude of the suicide risks and related information, he would have read, listened to, relied upon and heeded such warnings and instructions.   PFF 97.

Sandoz had multiple avenues through which it could have warned Dr. Abend regarding fluoxetine's risks (including, for example, "Dear Doctor" letters, journal publications, the Physicians' Desk Reference (PDR) and sales representatives), however, Sandoz never informed him of fluoxetine's true risks nor took any effort to ensure that its warnings would reach him.   PFF 107-116.   Importantly, Dr. Abend testified that, had Sandoz provided him with the true information regarding fluoxetine's suicide risks, including the need to co-administer sedatives to offset the suicide risks, he would not have prescribed fluoxetine and "**probably would have prescribed another medication**." Exh. 1, Abend Depo. at 271:11-275:24; see also PFF 96-97, 115.

## II.   AT THIS PROCEDURAL POSTURE, THE COURT IS OBLIGATED TO DRAW ALL INFERENCES IN PLAINTIFF'S FAVOR

The rules for granting summary judgment are well settled.   "[S]ummary judgment will not lie ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   In applying this standard, the Court should not weigh the evidence. *Id.* at 249.   Rather, the Court is obligated to view the record in a light most favorable to the party opposing summary judgment and must construe all evidence and reasonable inferences in favor of the non-moving party. *Id.* at 255.

### III. SANDOZ HAD AN AFFIRMATIVE DUTY TO WARN DR. ABEND REGARDING SERIOUS RISKS ASSOCIATED WITH FLUOXETINE AND IT FAILED TO DO SO

Sandoz' first argument is that it had no duty to warn Dr. Abend of a known risk. Specifically, Sandoz contends that Dr. Abend was already aware of the full magnitude of fluoxetine's suicide risks and offsetting remedies. The record, however, speaks otherwise. When shown various documents highlighting the frequency and severity of fluoxetine's suicide risks, Dr. Abend testified that he had never seen the documents nor was he aware of the information contained in them and he had never been warned by Sandoz (or anyone else) regarding the information and severity of the risks discussed in the documents. PFF 90, 93, 97, 102, 106, 107, 116. For example, Dr. Abend was never informed that patients taking fluoxetine during the early clinical trials were co-administered a sedative or tranquilizer to offset Prozac's stimulant-like side effects and that the German government eventually mandated an instruction regarding co-administration of sedatives to offset the suicide risk. PFF 87. More specifically, Dr. Abend testified:

> Q.     Did Lilly or Sandoz, at any point, inform you that Prozac should be coadministered with a tranquilizer?
>
> A.     No.
>
>      \* \* \*
>
> Q.     If a drug manufacturer, its own internal people, have come to the conclusion that in order to combat a suicide risk which they had become aware of, that their drug should be coadministered with a sedative or a tranquilizer to offset the suicide risk, don't you agree that that is information that you would have liked to have known prior to prescribing Prozac to any of your patients?
>
> A.     I would like to have known that.

Exh. 1, Abend Depo. at 177:23 - 179:20. When asked how his treating options would have changed had he been warned regarding the co-administration of sedatives, he

Plaintiff's Opposition To Sandoz, Inc.'s Motion for Summary Judgment

testified that he would not have prescribed fluoxetine and "probably would have prescribed another medication." *Id.* at 275:10-24.

Dr. Abend's testimony confirms that (a) Dr. Abend was never warned about the co-administration of fluoxetine with a sedative to offset its suicide risks; and (b) had he been warned regarding the frequency and severity of the suicide risk and need for co-administration of a sedative, he would not have prescribed fluoxetine and instead would have prescribed a different medication.[5]

## IV. SANDOZ' FAILURE TO PROVIDE ADEQUATE WARNINGS CAUSED PLAINTIFF'S INJURY

### A. Sandoz' "Failure to Warn" Is Not A Valid Defense to Plaintiff's Failure to Warn Claims

Sandoz' next argument is that, because Dr. Abend never read Sandoz' label, it should be absolved of all liability. The problem with Sandoz' argument, however, is that Sandoz never made its label accessible to Dr. Abend and never placed it into the PDR.

Sandoz' label (or prescribing information) apparently was only sent to pharmacies[6]. Because Dr. Abend does not work at a pharmacy, Sandoz' label never reached him. Indeed, the California Supreme Court recognized this fact when it held that "[m]any prescribing physicians would not come into contact with package inserts or warnings attached to the drug when the pharmacist filled the prescription." *Stevens v. Parke Davis & Co.*, 9 Cal.3d 51, 67, 107 Cal.Rptr. 45, 54 (1973). California law is clear, adequate warnings must be given to *treating physicians*, not simply to pharmacists. *Stevens*, 9 Cal.3d at 64 ("if adequate warning of potential dangers of a drug has been given to *doctors*, there is no duty by the drug manufacturer to insure that the warning

---

[5]   Sandoz also argues that Dr. Abend warned Noe regarding the suicide risk. Although Plaintiff disputes this fact, whether Dr. Abend warned Noe regarding the risk of suicide is irrelevant given that, had Dr. Abend been adequately warned by Sandoz regarding the severity of fluoxetine's suicide risks, he would not have prescribed fluoxetine to Noe – thus, the warnings (if any) Noe received would not matter because he would not have been prescribed fluoxetine and would not have been exposed to its lethal risks. PFF 97.

[6]   Plaintiff assumes that Sandoz at the very least sent its label to pharmacies. Sandoz has not produced *any* evidence that it ever provided its label to anyone.

---

reaches the *doctor's* patient...") (emphasis added).[7]  Here, Sandoz failed to produce *any* evidence that its label ever reached (or would have even been accessible) to Dr. Abend.

In light of the fact that package inserts don't reach physicians, to comply with California's learned intermediary rule, pharmaceutical companies utilize other means to make their warnings accessible to physicians, including, for example, placing their label in the PDR[8].  Sandoz, however, admits that it did not place its label in the PDR (see Fact No. 52), and the evidence Sandoz has produced in support of its motion confirms that it failed to include its label in the PDR.  See Docket No. 193-1 at 117, Exhibit B to Declaration of Natasha Daewood (table of contents of PDR shows entries for Lilly and various generic fluoxetine manufactures, but does not include a fluoxetine label for Sandoz); *see also* Docket No. 194-1, Sandoz' Statement of Fact No. 52.  Thus, it is disingenuous for Sandoz to argue that Dr. Abend's failure to review the Sandoz label warrants dismissal of this case when Sandoz never took any steps to warn Dr. Abend or to make its label accessible to him.  A Court recently rejected an identical argument advanced by a generic manufacturer:

> The Court finds Teva's argument as to the PDR to be somewhat disingenuous.  On one hand, Teva argues that proximate cause cannot be established because Dr. Hawes did not look up minocycline in the PDR.  It is undisputed, however, that Teva's minocycline product was not listed in the PDR at the time Dr. Hawes

---

[7]  The law in other states is in accord. *Kampmann v. Mason*, 921 So.2d 1093, 1096 (La.App., 2006) (generic drug manufacturer does not fulfil its duty under the learned intermediary doctrine by providing warnings to pharmacy wholesalers).  Indeed, even Sandoz appreciates that its duty is to Dr. Abend and not to pharmacists.  When Plaintiff asked Sandoz to produce all documents it exchanged with Rite Aid (Noe's pharmacy) regarding fluoxetine, Sandoz objected and refused to produce any documents on account that, "[u]nder the learned intermediary doctrine, Sandoz's duty to warn, if any, *runs to prescribing physicians*..." See Exh 61, Sandoz' Responses to Document Request No. 1 (Fifth Set).

[8]  The "PDR" refers to the Physicians' Desk Reference which is an annual publication compiling product information about prescription drugs.  The product information is provided by drug manufacturers who pay to have their product information (labels) included in the PDR. Each year, the PDR is sent free of charge to licensed physicians.  *Conte v. Wyeth, Inc.*, 168 Cal.App.4th 89, 98, n.4 (2009).

---

prescribed the medication.  When Plaintiffs point this fact out, Teva argues that it has no obligation to advertise in the PDR.  The Court has a problem with Teva attempting to bolster its argument with an impossibility.

*Weilbrenner v. Teva Pharmaceuticals USA, Inc.*, 696 F.Supp.2d 1329, 1343, n.19 (M.D.Ga. 2010).  Likewise, here, Sandoz should not be permitted to use its failure to warn as a basis to avoid liability in this failure to warn action.  If Sandoz' reasoning were adopted, it would encourage drug manufacturers not to relay *any* warnings to physicians and then utilize their inaction as a complete defense to products liability claims.  Such a policy would go against the weight of logic and precedent and would eradicate California Supreme Court precedent which mandates that drug manufacturers are required to warn treating physicians.  *Stevens*, 9 Cal.3d at 64.

**B.     Dr. Abend's "Failure" to Read A Warning that Was Never Issued To Him Does Not Absolve Sandoz of Its Liability, Particularly Given That Dr. Abend Testified He Would Not Have Prescribed Fluoxetine Had Sandoz Warned Him Regarding Its Risks**

A physician's failure to review (or inability to review) the label is not a litmus test to determining liability.  *See e.g.*, *Motus v Pfizer*, 196 F.Supp.2d 984, 997 (C.D.Ca 2001).  In *Motus*, although the physician unequivocally testified that he had not read the PDR or label, this Court noted that this would not have been fatal to plaintiff's case as long as the plaintiff asked the doctor: " Dr. Trostler, *if even without reading the package insert* you had become aware that Pfizer itself had disclosed that [what is the precise warning regarding suicide that plaintiff considers necessary], would you have prescribed Zoloft..." and the doctor had responded that his treatment option would have changed.  *Motus*, 196 F.Supp.2d at 997.  Thus, this Court implicitly held that the package insert is not a litmus test.  In line with this Court's ruling in *Motus*, Plaintiff's counsel asked Dr. Abend the key question and Dr. Abend testified that, had he been adequately warned,  he would not have prescribed fluoxetine and, instead, "would have prescribed another medication." Exh. 1, Abend Depo. at 275:23-24.

Q.   If in a few days before you had prescribed Fluoxetine, either Lilly or Sandoz had informed you, through any means of communication, whether a sales representative, "Dear Doctor" letter or however, regarding information contained in the documents that we just reviewed, for example, if they had told you that Prozac patients experienced a higher frequency of suicide events than patients given other antidepressants; that if you do prescribe Prozac, you should coadminister it with a tranquilizer to offset the increased suicide risks; that there was a statistically significant increase in the frequency of suicidal ideation in patients treated with Fluoxetine who were between the ages of 18 and 30; and that Prozac is only marginally effective -- marginally more effective than placebo in treating depression and may not even be effective in treating moderate depression; if Lilly or Sandoz had advised you of that information, would you have still prescribed Fluoxetine to Mr. Carrasco?

* * *

A.   I might have prescribed it, and I might not have prescribed it.

Q.   And even if you had prescribed it, would you at least have followed the instructions regarding the coadministration of tranquilizers?

* * *

Q.   If such a warning had been given?

A.   I would never coadminister another central nervous system drug with one that was prescribed.   I would rather give another drug if that was a recommendation.

* * *

Q.   Okay.   Doctor, this is for the purposes of clarifying the record for the previous question that we just asked. And my question was: If  Prozac's label indicated that it should be administered -- coadministered with a tranquilizer to offset the suicide risks inherent in Prozac, and the labels and

1   the instructions for the other antidepressants that you commonly utilize did

2   not have such a requirement, would you still have prescribed Prozac or

3   would you have prescribed a medication that didn't require the

4   coadministration?

5   A.   I probably would have prescribed another medication.

6   Exh. 1, Abend Depo. at 271:11-275:24.

7   The foregoing testimony confirms that, had Sandoz provided adequate warnings

8   to Dr. Abend, he would not have prescribed fluoxetine to Noe.[9]

9   **C.   Sandoz Had A Myriad of Avenues Available to It To Make Sure That Its Warnings Reached Dr. Abend, However, It Failed to Undertake Any Steps to Warn Dr. Abend**

10

11   Plaintiff's contention in this case is that Sandoz failed to adequately and properly

12   warn Dr. Abend regarding fluoxetine's risks and that it should have utilized available and

13   appropriate avenues to ensure that its warnings reached Dr. Abend (i.e., its package

14   insert, which was only sent to pharmacy wholesalers and never to treating physicians or

15

16   [9]   Sandoz relies on *Conte* in support of its contention that its failure to issue any
17   warnings absolves it of all liability.  In *Conte*, the court granted summary judgment in favor of the generic manufacturer because the physician never came into contact with the
18   generic manufacturer's warnings, which had only been sent to pharmacist wholesalers. *Conte*, 168 Cal.App.4th at 112.  Plaintiff respectfully contends that, on this issue, the
19   *Conte* court erred and the facts of *Conte* are distinguishable from this case.  It appears that, because the *Conte* court was engaged in analyzing the name brand manufacturer's
20   liability under a misrepresentation theory, it applied the same misrepresentation principles to the generic manufacturer, which had not made any representations.
21   However, Plaintiff's allegations against Sandoz are not based upon misrepresentations – rather, they are based upon Sandoz' concealment and failure to warn Dr. Abend as it
22   was required to do under California law.  *Stevens*, 9 Cal.3d at 64.  Moreover, unlike the *Conte* physician, in this case, Dr. Abend testified that, had Sandoz warned him, he would
23   have heeded the warnings and would have changed his prescribing decision.  PFF 97. Thus, Plaintiff has met her causation burden.  Moreover, *Conte* relied upon this Court's
24   *Motus* ruling, but, as discussed *supra*, in *Motus*, this Court implicitly held that a physician's failure to read the label is not fatal as long as the doctor testifies that he
25   would have altered his prescribing conduct had he been adequately warned.  *Motus*, 196 F.Supp.2d at 997.  The facts here are even more convincing – Dr. Abend did not fail to
26   read the Sandoz label – rather, the Sandoz label was never presented to him or made accessible to him to read.  Sandoz should not be allowed utterly to fail to issue any
27   warnings to Dr. Abend and then argue that Dr. Abend's "failure" to read a warning that was never given somehow excuses it of liability.  Such "impossibility" arguments have
28   already been rejected by other courts. *Weilbrenner*, 696 F.Supp.2d at 1343, n.19 (rejecting an identical argument that was advanced by the generic manufacturer).

Dr. Abend, is not an effective means of communicating warnings to treating physicians). Pharmaceutical companies can communicate through a myriad of venues and forums, including, for example, sales representatives, "Dear Doctor" letters, the PDR, CME presentations, seminars, and medical journal articles. As the California Supreme Court aptly observed:

> Many prescribing physicians would not come into contact with package inserts or warning labels attached to the drug when the pharmacist filed the prescription. "Dear Doctor" letters might have been easily disregarded in the bulk of everyday mail received by the physician. It was within reason for the jury to find such warnings inadequate and to hold Parke, Davis liable for failing to reasonably warn of the drug's danger.

*Stevens*, 9 Cal.3d at 67. Sandoz had multiple avenues through which it could have ensured *physicians* (including Dr. Abend) were advised of fluoxetine's risks. It could and should have revised its label and sent Dear Doctor letters to physicians or, at the very least, asked the FDA to send Dear Doctor letters to physicians regarding these risks. *See e.g.*, *Dorsett*, 699 F.Supp.2d at 1158 (discussing how two other antidepressant manufacturers, Wyeth and GlaxoSmithKline voluntarily sent Dear Doctor letters to physicians to warn them regarding suicide related risks); *Demahy v. Actavis, Inc*., 593 F.3d 428 (5th Cir. 2010) (holding that generic manufacturers can at the very least ask FDA to send Dear Doctor letters); *see also Swicegood v. Pliva, Inc*., 2010 WL 1138455, *4 (N.D.Ga., March 22, 2010) ("a reasonable juror could infer that if a generic drug changed its label through this process, a physician who prescribed the drug on a regular basis would have learned of the change and read the package insert for the generic drug. Therefore, Dr. Reese's reliance on the Reglan label instead of the generic MCP label does not entitle Pliva to summary judgment."). Indeed, even Dr. Abend testified that the label is not the sole means of providing warnings – drug manufacturers can utilize Dear Doctor letters and sales representatives. Dr. Abend testified that he would pay attention to warnings provided in letters and by sales representatives, and he would rely upon them

in making treatment decisions.[10]  PFF 115, see also Exh. 1, Abend Depo at 348:1-349:3.
Dr. Abend also testified he gets notified about enhanced warnings either by fax, letter or
something appears on his computer from the drug company.  *Id.* at 121:14-22.

Moreover, Sandoz could have published medical journal articles regarding the
risks associated with fluoxetine.[11]  Dr. Abend consulted medical journals to obtain
information regarding fluoxetine and independent studies have confirmed that physicians
rank "journals" as one of the primary sources on which they rely to  learn about drug
risks.  Puneet Manchanda & Elizabeth Honka, *The Effects and Role of Direct-to-
Physician Marketing in the Pharmaceutical Industry: An Integrative Review*, 5 YALE J.
HEALTH POL'Y L. & ETHICS 785, 796 (2005).

> **D.    Sandoz's Recitation of Irrelevant Facts Do Not Refute Dr. Abend's
>       Testimony That, Had He Been Adequately Warned, He Would Have
>       Altered His Prescribing Decision**

Sandoz recites various extraneous facts in support of its contention that Dr. Abend
would not have changed his prescribing decision had he been adequately warned.  For
example, Sandoz states that Dr. Abend routinely prescribed fluoxetine; Noe was a proper

---

[10]  Sandoz could also have utilized the sales representatives of its parent company,
Novartis, to warn physicians.  *Stevens*, 9 Cal.3d at 67 (holding that salespeople should
be utilized to warn physicians of drug risks). Novartis is one of the world's largest
pharmaceutical companies and employs an extensive sales team. *In re Novartis Wage and
Hour Litigation*, 611 F.3d 141 (2nd Cir. 2010) ("Novartis employs some 6,000 Reps
nationwide and assigns them to make what Novartis characterizes as "sales" calls on
physicians."). Plaintiff has served discovery on Sandoz seeking information regarding its
relationship with Novartis and whether any Novartis sales representatives met with Dr.
Abend (Dr. Abend testified that he received sales visits "from all companies" – Exh 1,
Abend Depo at 49:2). In response, Sandoz filed inappropriate objections claiming that
the term "Novartis" (its own parent company) is vague and that "it is impossible for
Sandoz to know to which Novartis entity this request refers."  *See* Exh. 61.  Sandoz'
Responses to Request Nos. 5 & 6 (Fifth Set).  When Plaintiff subpoenaed Novartis to
obtain this information, the same lawyers currently representing Sandoz filed objections
on Novartis' behalf. Thus, Sandoz's feigned ignorance regarding its own parent company
is not well taken. *See* Exh 60, Novartis' Objections to Subpoena.

[11]  Sandoz has a First Amendment right to publish journal articles regarding the
risks associated with its drugs. *See e.g. Thompson v. Western States Medical Center*, 535
U.S. 357, 365, 122 S. Ct. 1497 (2002); *see also Washington Legal Foundation v.
Friedman*, 13 F.Supp.2d 51, 62 (D.D.C. 1998) (drug manufacturers have First
Amendment right to engage in truthful speech and draft journal articles regarding their
products), vacated as moot by, *Washington Legal Foundation v. Henney*, 202 F.3d 331,
337, n.7 (D.C.Cir. Feb 11, 2000).

candidate for fluoxetine; Dr. Abend weighed the risks and benefits of fluoxetine; and Dr. Abend continued to prescribe fluoxetine to other patients even after Noe's suicide. However, these disputed, cherry picked, out-of-context and largely irrelevant facts ignore the key deposition testimony Dr. Abend provided – that, had he been properly warned by Sandoz or Lilly, he would not have prescribed fluoxetine to Noe and, instead, "would have prescribed another  medication."  Exh. 1, Abend Depo. at 271:11-275:24.

## V.    AS MANDATED BY *MOTUS*, DR. ABEND TESTIFIED THAT, HAD SANDOZ ADEQUATELY WARNED HIM, HE WOULD HAVE CHANGED HIS PRESCRIBING DECISION

Sandoz ends its motion by blatantly misrepresenting the record.  Sandoz states that Dr. Abend failed to testify that a different warning would have altered his prescribing decision and states that Plaintiff never asked the "right" question of Dr. Abend.  As outlined in Section IV(B), *supra*, pursuant to *Motus*, Plaintiff asked Dr. Abend whether he would have prescribed fluoxetine to Noe had Sandoz  provided him warnings regarding its true risks, and, Dr. Abend responded: "I might have prescribed it, and I might not have prescribed it." Exh. 1, Abend Depo. at 271:11-272:14.  When questioned further regarding what he would have done had he been warned regarding the need for co-administration of sedatives, he testified that he would not have prescribed fluoxetine but "***would have prescribed another medication***" because, as he had previously testified, "I would ***never*** coadminister another central nervous system drug with one that was prescribed.  I would rather give another drug if that was a recommendation." Exh. 1, Abend Depo. at 272:22-25; 275:10-24.

This testimony confirms that, pursuant to *Motus* and at this procedural juncture in which all inferences are to be drawn in her favor, Plaintiff has sufficiently established that Dr. Abend was not adequately warned and that Dr. Abend would have acted differently and "would have prescribed another medication" had be been adequately warned.  Exh. 1, Abend Depo. at 271:11-275:24; see also *Motus*, 196 F.Supp.2d at 995 (holding that plaintiff must adduce evidence that doctor "would have acted differently"); *Tucker v. SmithKline Beecham*, 701 F.Supp.2d 1040, 1067 (S.D.Ind. 2010) (denying defendant's

learned intermediary defense because there was an issue of fact as to what the doctor would have done had he been adequately warned regarding Paxil's suicide risks); *Forst v. SmithKline Beecham*, 602 F.Supp.2d 960, 969 (E.D.Wis. 2009) (because physician testified he "doesn't know" what he would have done had be been warned regarding suicide risks, Court held that there was a triable issue of fact as to whether physician would have prescribed Paxil had be been adequately warned); *Munroe v. Barr Laboratories, Inc.*, 670 F.Supp.2d 1299, 1305 (N.D.Fl. 2009) (denying generic manufacturer's learned intermediary defense because jury could reasonably infer that physician would have altered her conduct had she been adequately warned).[12]

## VI.   A TALE OF TWO CITIES

The facts of this case and the conduct of these two defendants exemplifies a quintessential dichotomy.  On the one hand, Lilly undertook extensive efforts to communicate with Dr. Abend to convince him that Prozac is a safe and effective drug. These facts are more fully outlined in Plaintiff's concurrently filed Opposition to Lilly's Motion for Summary Judgment and Plaintiff's Statement of Genuine Issues related thereto, but they include: personal monthly sales visits with Dr. Abend; free lunches and gifts to Dr. Abend and his office; free Prozac samples; distribution of promotional literature regarding Prozac; using its employees, consultants and "key opinion leaders" ("KOLs") to write favorable medical journal articles that were referenced in the journals Dr. Abend read and relied upon; advertising in the journals that Dr. Abend read; publishing Prozac's label in the PDR and sponsoring CME seminars.  Yet never once

---

[12]   Alternatively, Plaintiff contends that Sandoz should not be permitted to hide behind the shield of the learned intermediary defense for two independent reasons. *First*, Sandoz failed to issue any warning to Dr. Abend which is a condition-precedent to allowing an assertion of the learned intermediary defense, *see Stevens*, 9 Cal.3d at 64 ("*if* adequate warning of potential dangers of a drug has been given to doctors, there is no duty by the drug manufacturer to insure that the warning reaches the doctor's patient") (emphasis added).  *Secondly*, since at least the Fall of 2004, Sandoz has been obligated to warn patients directly through patient "Medication Guides" that discuss the suicide risks (PFF 117 - 121) – had Sandoz informed the medical community regarding the severity of the suicide risk in a more timely fashion, the FDA would have required it to issue similar Medication Guides when Noe was prescribed fluoxetine in July 2004.

---

through any of these activities did Lilly inform Dr. Abend that Prozac is associated with suicide risks and that co-administration of sedatives should be used to offset those risks. Lilly's overt misrepresentations (and concealment), on which Dr. Abend directly and indirectly relied, form the basis of Plaintiff's pending motion to amend the complaint to add a cause of action for fraud and concealment.

While Lilly courted Dr. Abend, Sandoz never once communicated with Dr. Abend. Notwithstanding its affirmative duty to warn Dr. Abend, Sandoz failed to undertake any effort to warn him or to ensure that its label (which was apparently only sent to pharmacy wholesalers) would reach him.  Notwithstanding its knowledge of fluoxetine's serious risks, Sandoz failed to take any steps to communicate these risks to Dr. Abend.  Instead, while reaping the rewards of fluoxetine's purchase, Sandoz took a struthious approach to its obligations and, now, boldly contends that its inaction excuses its negligence. Sandoz' failure to comply with its statutory and common law duties, its failure to provide any warnings to Dr. Abend, and its concealment of these risks properly serve as the basis of Plaintiff's negligence/strict-liability causes of action and pending fraudulent concealment allegations.

To be sure, Lilly's overt misrepresentations and Sandoz's negligent silence and concealment are differing evils, but they are the common work of two legally liable entities who should be held accountable for their actions and inactions.

## VII. CONCLUSION

When the thirteenth century poet-philosopher, Saadi, was once asked why he ceased traveling to a neighboring town, he responded by explaining what he had observed in the courtroom of that town:

> While robbing a house, a thief, surprised by the presence of the homeowner's son, picked up a loose brick and fatally struck the homeowner's son on the head.  The homeowner pressed charges and a judicial proceeding got underway.  In defense the thief argued that he is merely a thief and not a killer and the death of the son was not his fault but rather the fault of the bricklayer who had built a house with

a loose brick.  The magistrate summoned the bricklayer and asked him why he should not be punished.  The bricklayer in defense testified that it is not his fault as he did his job well and the cement must have been of poor quality.  The wrath of the magistrate then descended on the cement mixer who is accused of pouring too much water during mixing.  The cement maker admits that it happened, but attributes it to his required mandatory greeting of the passing King, a legally justifiable diversion that diluted the cement.  The magistrate could not punish the King and did not want to leave the death of the homeowner's son unpunished so to ensure that justice was dispensed he punished the homeowner (the decedent's father) for purchasing a house with a loose brick.

Lilly and Sandoz's multiple motions for summary judgment are, in some respects, reminiscent of Saadi's tale.  In its first summary judgment motion, Sandoz argued that it should not be held liable because, under FDA rules, it was bound to issue the same warning as the innovator, Lilly.  Thus, Sandoz implicitly argued that the blame lay with Lilly.  See Docket No. 84.  When Lilly was summoned, it, in turn, argued that it should not be held liable because it was bound to issue the warning approved by the FDA.  Thus, Lilly implicitly argued that the blame lay with the FDA.  See Docket No. 81.  The Court properly rejected these arguments and held that both Lilly and Sandoz had a duty to issue appropriate warnings. *Dorsett*, 699 F.Supp.2d at 1163.  Now, with their latest summary judgment motions, Lilly and Sandoz have found a new target to blame for the tragic death of Plaintiff's son – they argue that the conduct of the decedent's prescribing physician somehow excuses their own negligence and fraud.  Like their previous summary judgment motions, defendants' most recent summary judgment motions are factually, logically and legally devoid of merit and should be DENIED.

Respectfully submitted,

Dated: November 8, 2010                    BAUM HEDLUND ARISTEI & GOLDMAN, P.C.

1

By: /s/ Bijan Esfandiari
Bijan Esfandiari

*Attorneys for Plaintiff*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 8, 2010, a copy of the foregoing **PLAINTIFF'S OPPOSITION TO DEFENDANT SANDOZ, INC.'S MOTION FOR SUMMARY JUDGMENT ON GROUNDS OF LACK OF DUTY AND PROXIMATE CAUSE** was filed electronically. Notice of this filing will be sent to the following by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. As indicated below, service by US Mail, First Class postage prepaid, has been effected on those individuals who are non-participants in the ECF Filing system.

*Attorneys for Defendant, Sandoz*
Richard A. Clark, Esq.
Natasha N. Dawood, Esq.
Parker Milliken Clark O'Hara Samuelian
555 So. Flower St., 13th Floor
Los Angeles, CA 90071
Tel: (213) 683-6500   Fax: (213) 683-6669
Rclark@pmcos.com
Ndawood@pmcos.com

Joe G. Hollingsworth, Esq.
Eric G. Lasker, Esq.
Kirby T. Griffis, Esq.
Stephen A. Klein, Esq.
HOLLINGSWORTH LLP
1350 I Street, NW
Washington, DC 20005
Tel: (202) 898-5800   Fax: (202) 682-1639
Kgriffis@spriggs.com
Sklein@hollingsworthllp.com
csloane@spriggs.com

*Attorneys for Deft., Eli Lilly and Company*
Michelle M. Fujimoto, Esq.
Natasha L. Mosley, Esq.
SHOOK HARDY & BACON LLP
5 Park Plaza, Suite 1600
Irvine, CA 92614
Tel: (949) 475-1500   Fax: (949) 475-0016
Mfujimoto@shb.com
Nmosley@shb.com

Christopher Gramling, Esq.
Andrew See, Esq.
SHOOK HARDY & BACON LLP
2555 Grand Blvd.
Kansas City, MO 64108-26123
Tel: (816) 474-6500   Fax: (816) 421-5547
Cgramling@shb.com

/s/ Bijan Esfandiari
Bijan Esfandiari, Esq.
BAUM HEDLUND ARISTEI & GOLDMAN, PC
12100 Wilshire Boulevard, Suite 950
Los Angeles, California 90025-7106
Telephone: 310.207.3233
Facsimile: 310.207.4204
E-Mail: besfandiari@baumhedlundlaw.com